## THE HARTFORD MANILLA COMPANY *vs.* SIDNEY OLCOTT AND OTHERS.

Whether the injurious effect upon the health of the neighborhood of the flooding of a wide tract of low land, may be considered in determining whether a petition under the flowage act should be granted :— *Quære*.

If it may be, yet it should be set up in defense as a special matter and cannot be gone into under a mere denial that the taking of the land for mill purposes will be of public use.

The flowage act provides that no dam shall be erected under it to the injury of any mill-site on the same stream on which a mill or mill dam shall have been lawfully erected and used, unless the right to maintain such mill or dam has been lost or abandoned. The plaintiffs brought their petition in 1881. In 1862 *S*, one of the defendants, had built a dam across a large brook running into the stream on which the plaintiffs' dam was erected, and at intervals for three years had done work on a canal running from the dam to the main stream, the proposed site for a mill being at the mouth of the canal, at a point injuriously affected by the plaintiffs' dam. His sister then owned the land, and she refused to sell it to him. In 1869 the dam was broken by a flood and in the course of three years was almost wholly carried away. In 1872 *S* purchased the land from the estate of his sister who had died, but no more work was done on the dam or canal until 1881, after the plaintiffs' suit was brought, when *S* sold the land to *J*, another of the defendants, who expended a considerable amount in rebuilding the dam and in work upon the canal. The operations of *S* had been under a scheme which he had long had of making a valuable water power there, but neither he nor *J* had ever settled some important

details of the construction of the canal, nor decided what kind of mill should be built. Some riparian proprietors below the dam had rights which would interfere with the plan. The committee found that there was no mill-site on which a mill dam had been lawfully erected and used, under the statute. Held that the question was properly one of fact for the committee to decide, but that, if it could be regarded as a question of law upon the facts, their decision was right.

The statute also provides that the damages and costs shall be paid before the land is flooded and within sixty days after the proceedings on the petition are ended, and that, if not so paid, the proceedings shall be of no effect. The plaintiffs had in fact constructed their dam before bringing their petition, but had not flooded the land. During the hearing before the committee the defendants requested the plaintiffs to flood the land that it might be seen exactly how far the water would extend. They did so, and afterwards refused, at the defendants' request, to draw off the water, and the pond was kept full from that time. Held that this was a matter between the parties outside of the proceedings before the court and that it did not vitiate the proceedings.

And held not to be error for the court not to require in its decree that the water be drawn off.

[Argued January 8th—decided February 26th, 1885.]

PETITION under the flowage act (Gen. Statutes, tit. 19, part 6;) brought to the Superior Court in Hartford County. Decree in favor of the petitioners and appeal by the defendants. The case is sufficiently stated in the opinion.

*A. P. Hyde* and *C. H. Briscoe*, for the appellants.*

The court erred in ruling that upon the inquiry whether the dam would be of public use all evidence as to the effect of the proposed pond upon the public health was inadmissible upon such issue, and in excluding the testimony of various witnesses offered upon that point. The statute provides that upon a flowage petition, if it shall be found by the committee " that the flowing or taking such land in the manner proposed will be of public use," they shall proceed to fix regulations for the flowage of the land. Gen.

---

* The principal question in the case, whether the effect of flooding land upon the health of the people living in the vicinity can be considered upon such a petition, was not decided by the court, but the question is one of so much public interest that it is thought best to give the briefs of the counsel upon it, omitting the other heads of their arguments.—R.

Statutes, p. 472, sec. 2.   This fact of "public use" must be
established—1st, by the finding of the committee, (sec. 2);
2d, by the finding of the Superior Court, which must, if
required, inquire for itself whether the erection of the
dam is of public use or not, nothwithstanding any find-
ing of the committee, (sec. 4.)   This is the crucial fact
to be found before any dam can be raised.

What is this public use which is to be found?   It is
clear that it is not enough that it will promote the interests
of the private individual or private corporation asking it.

Such a construction would simply allow the property of
one citizen to be taken for the use and benefit of another,
though the public had no interest in the matter.   On the
other hand, it has been held by our court that the right of
flowing need not be in the name or behalf of the public, or
that the public should necessarily have a right to partici-
pate in its enjoyment.   In *Olmstead* v. *Camp*, 33 Conn.,
532, Judge McCurdy, quoting Chief Justice Bigelow,
says (p. 548:)—"Everything which tends to enlarge the
resources, increase the industrial energies and promote the
productive power of any considerable number of the in-
habitants of a section of the state, or which leads to the
growth of towns and the creation of new resources for the
employment of capital and labor, evidently contributes to
the general welfare and the prosperity of the whole com-
munity."   And it was held on p. 550 that in this statute
"the term 'public use' is synonymous with public benefit
or advantage.   It is equivalent to the language, so familiar
in our statute in relation to highways, 'of common con-
venience and necessity.'"   See also *Todd* v. *Austin*, 34
Conn., 78.

It therefore seems to us clear, that whether the proposed
flowing will be of public use or not must be determined by
a consideration of the incidental advantages and disad-
vantages which may be expected to accrue to the public
from the proposed work; and is not to be controlled by the
wishes or interests of the petitioner on the one side or the
rights or interests of the owner on the other.   These ad-

vantages and disadvantages will necessarily differ in different cases. The question of public use must be determined under all the circumstances. *Olmstead* v. *Camp*, 33 Conn., 532. And with a *bonâ fide* and not unreasonable exercise of discretion. *Todd* v. *Austin*, 34 Conn., 78.

It will not be claimed that, in a case where no other public interest was involved, it would be for the public benefit to depopulate and destroy a flourishing village above the proposed dam upon the hope that a smaller and less prosperous or populous village might be built below the dam. So it would seem to be a legal farce for the court to hold that public use required a dam to be built which would be a public nuisance, and which the same court would abate, as such, if erected. This court will not put itself in the position of inviting a multiplicity of suits, or granting with one hand as a public benefit that which with the other it must suppress as a public nuisance, which the evidence rejected tended to prove. Even in the case of a public highway considerations outside of the use of the road are admissible on the question of its convenience and necessity, as for instance the cost as compared with the financial ability of the town to meet it. In other words, the question of "public use" or "public benefit" depends upon a consideration of the effect which the proposed work will have upon the public after considering all the circumstances. *Bristol* v. *Town of Branford*, 42 Conn., 321, 323.

The right to prevent pollution of a stream is clear. It would seem to follow that a similar right would exist against any parties who by their acts render a stream, the waters of which are already polluted, more injurious and dangerous to the health of the public than they otherwise would be. *Silver Spring Co.* v. *Wanskuck Co.*, 13 R. Isl., 611.

*D. S. Calhoun* and *A. F. Eggleston*, for the appellees.

What is a public use, which justifies the exercise of the power of eminent domain, is a question finally for the court; but the legislature is the sole judge as to the expediency of

exercising the power. *Great Falls Co.* v. *Fernald*, 47 N. Hamp., 444; *Ash* v. *Cummings*, 50 id., 614. The legislature has declared through the flowage act that it is expedient to exercise the power of eminent domain in bringing into practical use, for manufacturing purposes, the streams of the state, leaving it in each instance to a committee appointed by the Superior Court or to the court itself, if required, to say whether the proposed enterprise of the mill-owner, which will flow the land of another, " will be of public use."

This court has twice considered the question of public use in connection with the flowage act, and defined the meaning and scope of the term as employed in this statute. In *Olmstead* v. *Camp*, 33 Conn., 551, this court said:— " We understand it to be the settled law of the country that the flowing of land for the purposes of mills and manufactories, in view of its effect upon the community, is to be considered as a taking it for public use." In *Todd* v. *Austin*, 34 Conn., 90, Judge BUTLER says:—" The legislature may lawfully grant rights of easement to individuals or corporations, to enable them to erect and operate structures, if the result of their operation is the production of an article or thing intended to be furnished or sold to the public for a beneficial use, and to supply their reasonable wants. This proposition covers the case in hand as it does either of the other three [railroad, water and gas companies,] for the flowage law is intended to grant rights of easement which will enable individuals or corporations to enlarge or erect and operate structures, the result or production of the operation of which will be articles (such as cotton or woolen cloth, and the like,) intended to be sold to the public for their necessary and beneficial use." Judge BUTLER limited the inquiry upon the question of public use to the consideration of the character of the result or product of the operation of the mill, and whether the same is intended to be sold to the public for their necessary and beneficial use. It would seem that this must be the true rule, and that if such product is a useful article, intended to be sold to the public

Hartford Manilla Co. v. Olcott.

for their necessary and beneficial use, the fact of "public use" must be found.

In the present case the court went further in its inquiry. It not only inquired into the character of the product of the mill, and whether it was intended to be sold to the public for their benefit, but it also inquired into the size of the mill, the capital invested, the amount of daily production, its value, the necessity of flowing the defendants' land for the uses of the mill, the pay-roll for the plaintiffs' operatives, and the collateral benefits which the public would receive from the operation of the plaintiffs' mill. The defendants, however, insist that, in determining whether the flowage of their land by the plaintiffs will be of public use, they have the legal right to interpose that the plaintiffs' pond, when raised, will be a common nuisance and detrimental to the health of the public. The defendants do not claim any special injury from such effects, or that their own health will be affected at all. Their position seems to be that, although the hearing on the question of public use is limited by the statute itself to the flowage of the defendants' land, they have the right to show that the pondage on the lands of the plaintiffs and others, exclusive of their own, will create a public nuisance. In other words, that if such were the fact, and they would have no cause of action against the plaintiffs, they themselves suffering no special damage, they can obstruct, by the interposition of a public grievance, the operation of the flowage act upon their own land, whether the quantity of their land to be taken be one square foot or any other area. The statement of the legal proposition reveals its absurdity.

If the plaintiffs' pond shall produce a public nuisance, the public have a remedy for its abatement. *Eames* v. *New England Worsted Co.*, 11 Met., 570; *McNally* v. *Smith*, 12 Allen, 455.

But this whole matter of the effect of the plaintiffs' pond upon the public health was thoroughly inquired into before the committee, without the plaintiffs' objection, and the committee have made a finding respecting it, at the defendants'

request.  The finding of the committee is that Hop brook is fouled by sewage and by refuse of mills before its confluence with Hockanum river, and that these impure waters when ponded by the plaintiffs in the manner proposed, will cause offensive odors, and may prove to be detrimental to the health of persons living in the neighborhood.  The court finds that "the plaintiffs' pond is located in a sparsely populated district."  The facts which the committee find respecting the plaintiffs' mill-pond are probably true of most mill-ponds in New England.  But the plaintiffs do not foul Hop brook or Hockanum river, above their dam.  It is not proved that the villages or the upper proprietors foul Hop brook unreasonably, or that they use the waters for unlawful purposes.  It does not appear that the defendants have ever taken any action toward preventing the fouling or corrupting of Hop brook by upper proprietors.  Indeed, notwithstanding the alleged injurious effect upon the public health from ponding these impure waters, the defendants contend that they themselves desire and intend to pond the waters of Hop brook.

We hold that the limit of inquiry as to "public use" in a flowage case, is the *bona fides* of the application and the character and extent of the product of the mill, and that any other construction of the statute would render its application impossible and nullify its provisions, not only by making impracticable all future attempts to take advantage of its provisions, but also by endangering rights already obtained under it.  *Baird* v. *Hunter*, 12 Pick., 556; *French* v. *Braintree Mfg. Co.*, 23 id., 216; Gould on Waters, § 584; Mills on Eminent Domain, § 57.

CARPENTER, J.  This is an application to take land for public use under the flowage act.  Judgment was rendered for the plaintiffs, and the defendants appealed.

After the committee reported in favor of the plaintiffs, the defendants under the statute required the court to inquire for itself whether the erection of the proposed dam would be of public use.  On the hearing before the court

the defendants offered to prove that the waters of the stream were polluted by the refuse and sewage from the villages and manufacturing establishments above; that they carry in suspension large quantities of vegetable and animal substances, which will be carried over and deposited on the additional lands so flowed, and which will ferment under the effect of the sun and heat, as the pond is drawn down in its daily use, and cause offensive odors and noxious gases to arise to the great injury of the comfort and health of the inhabitants. Evidence on that subject was objected to by the plaintiffs, and excluded by the court.

Was that evidence properly excluded? Did it tend to prove any fact put in issue by the pleadings? The complaint alleges that " the raising of said dam and the consequent flowing of said land will be of public use." That paragraph the defendants deny. That presents the whole issue in respect to the public use. It is not set up as a defense that the flowing of the land as proposed will be of injury to the public health. Can that fact be proved without pleading it? In other words, is the effect upon the public health involved in the question of public use? It certainly is not if that issue is limited to the question whether the business carried on results in the " production of an article or thing intended to be furnished or sold to the public for a beneficial use, and to supply their reasonable wants." If we enlarge the scope of the issue, as the plaintiffs' counsel suggest was done in this case, so as to authorize the additional inquiry as to " the size of the mill, the capital invested, the amount of daily production, its value, the necessity of flowing the defendants' land for the uses of the mill, the pay-roll for the plaintiffs' operatives, and the collateral benefits which the public would receive from the operation of the plaintiffs' mill," still we fail to find any ground for the claim that evidence is admissible as to the effect upon the public health. The issue does not even suggest such an inquiry. The streams of this state are not yet so extensively polluted as to afford any presumption that the detention of water for manufacturing

purposes will be detrimental to the public health. Hence it is not expected that the plaintiffs will be prepared in the first instance to offer proof on that subject, especially as any proof that they will be likely to offer will necessarily be of a negative character. If in any given case the ponding of water will be injurious, we apprehend that it is exceptional and not the rule. If so it is a matter for the defendants in their answer to bring to the attention of the court. They take the affirmative of that issue. In offering proof to sustain it they offer nothing in conflict with the plaintiffs' evidence that the proposed enterprise will be of public use. It is in the strictest sense matter of avoidance. The defendants practically say—true it is that your proposed mill will be of public use, but you ought not to be permitted to erect it and carry on your business because it will result in a nuisance which the courts must abate. It seems to us therefore that this is a matter wholly distinct and independent of the issue presented by the pleadings. It has no necessary or natural connection with it. If it is brought into the case at all, therefore, it must be brought in by the defendants in their answer as a defense. As that was not done the evidence was not admissible.

We do not intend to intimate that a defense of this character would probably be successful, or that it would not. It is as yet perhaps an open question how far the pollution of such a stream is unhealthy. Admit that it may be so to those living on its immediate banks, yet neither observation nor science has told us how far the deleterious influence extends. We apprehend that it is mainly a question of fact; and when such a defense is once established as a fact, then perhaps it will be for this court to determine whether a case so situated is an implied exception to the operation of the flowage act.

It is claimed in the second place, that the court erred in authorizing the plaintiffs to flow the land of the defendants to the injury of a mill-site owned by them.

The plaintiffs deny that the defendants have any mill-site. The facts found by the committee relating to this

claim may be briefly stated as follows :—The plaintiffs' dam is on Hockanum river, about three miles below its junction with Hop brook.   About forty years ago Sidney Olcott conceived the scheme of constructing a dam across Hop brook about one mile above its mouth, and taking the water therefrom by means of a canal to a point below the confluence of the two streams, and then using it for mill purposes, discharging the water into Hockanum river.   In 1862, in pursuance of this scheme, he built a dam across Hop brook, and at intervals did some work on the proposed canal for a period of about three years.   His sister then owned the land on which the dam was built, and also the land at the lower end of the canal.   She never favored the scheme, nor did she intend to engage in manufacturing herself ; and she refused to sell her land to Sidney Olcott for that purpose.   In 1869 this dam was partially destroyed by a flood, and in the course of three years was carried away to such an extent as to leave no substantial obstruction to the flow of water.   In 1872, after the death of his sister, he purchased the land which had belonged to her, with a view to develop and carry into effect his scheme for a mill at the mouth of the proposed canal, but nothing more was done until after the bringing of this suit, when some work was done for the purpose of affecting the determination of the suit.   The defendants never had any definite plan as to the time when the proposed mill should be constructed, as to the size or kind of mill, nor as to the business to be carried on.   There was land on the opposite side of Hop brook, below the defendants' dam, which was owned by other parties, who had a right to insist that the water should flow by and past their lands as it had been accustomed to do.  " Upon these facts " the committee say, " we do not find that on the stream on which the plaintiffs' dam is, there is any mill site on which a mill dam has been lawfully erected and used, which will be injured by the erection of the plaintiffs' dam."

The committee however left it for the court to determine otherwise as a conclusion of law, and made a finding as to

the effect of the plaintiffs' dam upon such a mill-site. We think the committee correctly disposed of it as a question of fact. Sidney Olcott certainly had no mill-site prior to 1872, because he did not own the land, and the owner neither contemplated nor desired the erection of a mill, and refused to sell her land for that purpose. After 1872, although he owned the land, yet he had no mill-site, for he could not lawfully divert the water from the down stream proprietors.

In the next place, the defendants contend that the court erred in allowing the amendment of December 23d, 1881, increasing the height of the dam prayed for, from four feet to four feet and eight inches, and in passing a decree allowing the dam to be raised to that height.

It will be observed that the objection to the allowance of the amendments relating to the description of the land to be taken is not pressed. No objection seems to have been made to the amendment relating to the height of the dam at the time. When the report of the committee was returned to the Superior Court, the amendment itself was not objected to, but the defendants filed a motion in writing that the facts found by the committee relating to all the amendments be stricken out. The court denied that motion. In this court, while the reasons of appeal allege that the court erred in allowing the amendment increasing the height of the dam prayed for, the arguments of counsel under this head do not relate to the allowance of the amendment, but are limited to a question as to the construction and effect of the amendment. Even that question does not seem to have been raised in the court below. Nevertheless, as the question is free from doubt, we will express our opinion. The principle involved is, that if an amendment, if allowed to take effect as of the date of the original bill, will affect injuriously the rights of parties, it will be regarded as taking effect at the date of the amendment, and that the suit, to the extent of the amendment, will be regarded as pending only from that time. In order to avail themselves of this principle the defendants must make it appear that they

had a mill-site, or some right or interest in one, at the date of the amendment, which they did not have at the commencement of the suit; and for that purpose they assume that they once had a mill-site which they had lost or partially lost by non-user, and that the assertion of their right by labor performed in 1881 rescued their privilege or some portion of it from the consequences of their inaction, or that such labor in some way gave them some rights which they did not have before or preserved some rights which would otherwise have been lost. This is a mistaken assumption; for it is not found, and we do not hold, that they once had a mill-site which has been lost or partially lost by abandonment or otherwise, but it is found, and we do hold, that they never had a mill-site. Consequently the principle referred to can have no application.

From this view of the case it is obvious that the error of the court, if it be one, in refusing to erase from the committee's report the facts relating to the amendments, is immaterial. Those facts have no bearing upon the question here discussed. They tend to show that the amendments were properly allowed, but that question, as we have seen, is not now before us.

The defendants further contend that "the court erred in passing the decree without ordering the payments required by the statute to be made before flowing the defendants' land." It appears in the case that in January, 1882, the plaintiffs, at the defendants' suggestion, the dam having been then constructed to the height asked for, filled the pond with water for the purpose of ascertaining how much land would be flowed. The plaintiffs afterwards refused to draw off the water and have kept up the pond ever since.

The eighth section of the flowage act provides that the damages and costs shall be paid "before the water is flowed upon such lands, and within sixty days after the proceedings on said petition are ended; and if such damages and costs are not so paid or deposited, the whole proceedings shall be of no effect." The decree requires the damages,

&c., to be paid "in accordance with the provisions of the statute in such case provided."

The defendants' grievance seems to be that the court did not require the pond to be drawn down before passing the decree. We think that was a matter between the parties outside of the proceedings before the court. The statute requires the damages to be first paid; but it does not declare in terms that flowing the lands before the damages are paid vitiates the proceeding. Whether such a construction is required by implication we need not now determine, as we are of the opinion that a refusal by the plaintiffs to draw off the water from the defendants' land, after having flowed it at their request, will not have that effect.

There is no error in the judgment.

In this opinion the other judges concurred.